**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL NO. ELH-11-358** |
| | **:** | |
| **ANDREW JACKSON,** | **:** | |
| a/k/a "**Humpty**," | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

.oOo.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANT ANDREW JACKSON'S PRETRIAL MOTIONS**

Now comes the United States of America, by and through its counsel, Rod J. Rosenstein, United States Attorney for the District of Maryland, and Joshua L. Kaul, Assistant United States Attorney for the District of Maryland, and respectfully submits this Consolidated Response to Defendant Andrew Jackson's Motions to Suppress and to Preserve Evidence.[1]  For the reasons set forth below, the government respectfully requests that Jackson's Motions to Suppress be denied on the merits and that his Motion to Preserve Evidence be denied as moot.

**FACTS**

This case arises out of an investigation into a conspiracy among several individuals, including Maurice Hardy and Andrew Jackson, to distribute narcotics.  During the course of this investigation, law enforcement officers obtained information from confidential sources/informants regarding Hardy's and other co-conspirators' involvement in the distribution of narcotics; intercepted Hardy and other co-conspirators engaging in apparently drug-related conversations with Anthony Griffin (whose phone was being wiretapped at the time); observed Hardy engaging in

---

[1] The government is responding only to the motions filed by Jackson, as it understands that the other defendants in this case who have filed motions are not persisting in those motions.

conduct that appeared to be drug-related; conducted searches of Hardy's trash that resulted in the recovery of, among other things, a gallon-size ziplock bag that contained trace amounts of a substance that field-tested positive for the presence of cocaine; and obtained apparently drug-related text messages sent to and from the cellular telephone assigned number (443) 359-9132 (the "A-Line"), which was being utilized by Hardy.  *See* Affidavit in Support of Application to Intercept Communications over (443) 359-9132 (Exhibit 1) at Bates 676-95, 713-17.[2]

On May 5, 2011, law enforcement obtained authorization from Wicomico County Circuit Court Judge W. Newton Jackson III to intercept communications to and from the A-Line.  *See* Order Authorizing Interception of Communications over the A-Line (Exhibit 2).  From May 10 through May 12, officers intercepted calls over this line that both confirmed that Hardy was involved in the distribution of narcotics and led investigators to believe that Hardy would soon be participating in drug-related transactions.  On May 10, for example, Hardy asked Anthony Hardy, who was utilizing telephone number (347) 782-3602, if he had "any of them things all together," adding that the other thing was gone and that some people had said that it did not taste right.  Anthony Hardy said he might have one that is yummy.  Maurice Hardy then said that he was waiting on his people, but he added that he could probably do "three or four" if Anthony Hardy came across something that was "100."  Anthony Hardy clarified that he had more than one, but not more than one of what would work for Maurice Hardy.  *See* Selected Intercepted Communications (Exhibit 3), Call A-114.

In a call the following day, Maurice Hardy informed Anthony Hardy that his people had just come through.  Maurice Hardy indicated that he had been ready for Anthony Hardy that morning

---

[2]Specific pages of the exhibits to this Consolidated Response are cited herein by Bates number.

and was going "to buy it," but Anthony Hardy never hit him back.  Maurice Hardy added that he

would show Anthony Hardy where Maurice Hardy's people were at and let Anthony Hardy see a

"couple joints."  Maurice Hardy stated that he got 7 of them but they want 31.5.  *See* Exh. 3, Call

A-243.  On the same day, Irving Polk, who was utilizing telephone number (443) 366-6527, sent

Maurice Hardy a text message that said, "Can I get 15 for a stack a piece."  Exh. 3, Call A-202.

Hardy responded, "Yeah all the money up front."  Exh. 3, Call A-204.  Polk then sent the following

text message: "My man want 9 but he says he been payin a stack and says he won't pay no more

than 1050.  I was gonna buy the other 6."  Exh. 3, Call A-206.  In a call later that day, Hardy told

Polk "that's what the numbers is, man," unless "you got the cash money up front."  Hardy added that

others were paying 11 or 12.  *See* Exh. 3, Call A-219.  The next day, May 12, 2011, at approximately

12:20 p.m., Maurice Hardy informed Arnold Williams, who was utilizing telephone number (419)

203-0499, that he was meeting "Shorty" right now; as soon as he met him, he was going to run back

to Jamy's and have her wait while he checks it out; and he would get everything together and come

right to Williams.  Williams and Hardy discussed Hardy's getting the "skizzy-wizzy," and Hardy

asked if Williams needed "biz-ags," which Williams said he did.  *See* Exh. 3, Call A-313.  Hardy

then informed Polk, in a call at approximately 12:41 p.m., that he was going to give Polk "the 15 .

. . for the 10-50" and told Polk to give him about 30 minutes.  *See* Exh. 3, Call A-321.

       At approximately 1:20 p.m. on the same day, law enforcement observed Hardy leaving Jamy

Toadvine's residence in a Ford Fusion rental car.  Surveillance followed Hardy to the parking lot

of Chesapeake Treasures Seafood Shop in Salisbury, Maryland, where Hardy pulled up next to a

black Honda Accord that was later identified as a 2003 Honda Accord bearing Maryland license

plate 2AG8640 (the "Accord") that was being driven by Andrew Jackson.  Law enforcement officers

also observed in the parking lot a light-colored Acura bearing Maryland license plate 2A13522 that was being driven (it was later determined) by co-conspirator Austin Roberts III.  As Hardy parked next to the Accord, Jackson, who was outside of his vehicle when Hardy pulled up, went to truck of the Accord, retrieved a package, and handed the package to Hardy.  Hardy placed the package in the Ford Fusion in which he had arrived, retrieved a shopping-style bag from the Ford Fusion, opened the passenger-side door of the Accord, and put the bag in the Accord.  Jackson reentered the Accord at this time, and Hardy walked over to the Acura (Roberts' vehicle) and entered on the passenger side.  Hardy exited the car approximately one minute later and reentered his car.  At approximately 1:37 p.m., the three vehicles exited the parking lot.  Surveillance was maintained on the Accord as Jackson left the parking lot and traveled on Mill Street and then westbound on Business Route 50.  *See* MSP Report re Events of May 12, 2011 (Exhibit 4) at Bates 2100-01.

After being instructed to attempt to obtain independent probable cause to conduct a traffic stop of the Accord (Jackson's vehicle), Corporal Burley Williams of the Wicomico County Sheriff's Office observed that the tint of the front windows on the Accord exceeded the legally permissible degree of tint,[3] and he conducted a traffic stop of the Accord at approximately 1:45 p.m.  The Accord pulled over into a gas station parking lot, and Jackson exited the vehicle.  Cpl. Williams exited his patrol vehicle, approached Jackson, and requested Jackson's driver's license and registration. Jackson reentered the Accord and sat down in the driver's seat.  Jackson provided a change-of-address card identifying him as Frederick Williams of Baltimore, Maryland, and Cpl. Williams observed that Jackson's hands were noticeably trembling as Jackson handed the document to him.

---

[3]A subsequent inspection of the windows confirmed that the tint on the Accord's windows exceeded the legally permissible degree of tint.  *See* Report re Vehicle Inspection and Certification Form (Exhibit 5).

Jackson then attempted to remove his license from his wallet and had a difficult time doing so; and Jackson's hand was still trembling when he removed the license and handed it to Cpl. Williams.[4] Cpl. Williams subsequently requested the registration an additional time, and Jackson provided it to Cpl. Williams.  *See* Incident/Investigation Report for May 12, 2011 (Exhibit 6) at Bates 2539.

While waiting to receive the above-described items from Jackson, Cpl. Williams smelled an overwhelming odor of air freshener coming from the Accord.   Cpl. Williams requested that Detective First Class ("DFC") Richardson of the Wicomico County Sheriff's Office and his narcotics-detection canine "Fogy" respond to the scene in order to conduct a canine scan of the Accord, and they arrived less than five minutes after the initiation of the traffic stop.   After their arrival, TFC Richardson and Fogy conducted a canine scan of the Accord, and Fogy alerted to the presence of narcotics.   *See* Exh. 6 at Bates 2539; Canine Incident Report Dated May 12, 2011 (Exhibit 7) at Bates 2535; Video of May 12, 2011 Traffic Stop (Exhibit 8).

Following Fogy's alert, Cpl. Williams began searching the Accord.   While doing so, Cpl. Williams detected the odor of raw marijuana coming from the driver's seat. Cpl. Williams removed the rear seat panels of the front seats, and he observed trace amounts of marijuana.   As he was searching the rear passenger compartment of the vehicle, Cpl. Williams located two electronically controlled hidden compartments constructed into the quarter panels and accessible through the interior trim panels of the car.  Cpl. Williams pried open the compartment on the passenger side, revealing numerous bundles of U.S. currency, some of which were packaged in clear glassine baggies.   At that point, Cpl. Williams stopped searching the vehicle and asked Jackson if he had any

---

[4]The license was a Florida license identifying Jackson as Frederick Williams.  Later that day, after another law enforcement officer viewed the license, the officer advised that the individual was in fact Andrew Jackson, and Jackson subsequently admitted to his real identity.  Exh. 6 at Bates 2539-40.

knowledge of the currency or compartments.  Jackson said that he did not.  *See* Exh. 6 at Bates 2539-40; Exh. 8.

Cpl. Williams transported the Accord to the Wicomico County Narcotics Task Force's facility, and he subsequently obtained a search and seizure warrant for the Accord that was signed by Somerset County District Court Judge Paula A. Price.  *See* Search Warrant for Accord and Supporting Documents (Exhibit 9).  After obtaining the warrant, Cpl. Williams and other officers conducted a further search of the Accord, ultimately recovering $20,000 from the driver's-side compartment and $144,105 from the passenger-side compartment, for a total of $164,105.  The money was packaged in bundles, a manner of packaging that is consistent with large-scale drug trafficking.  Six cellular telephones and miscellaneous papers were also recovered from the vehicle.  *See* Exh. 6 at Bates 2540.

Subsequent to the stop and search of Jackson's vehicle, Hardy participated in several conversations regarding that stop (as well as several drug-related calls).  In a telephone call at approximately 2:40 p.m. on May 12, 2011, for instance, a male informed Hardy that they had just run down "Humpty" (i.e., Jackson) at an Exxon.  *See* Exh. 3, Call A-354.  In a call later that day to Toadvine, Hardy said that "it's ugly for big homie" (i.e., Roberts), adding that Humpty was "making . . . moves" for Roberts and "they" (i.e., law enforcement) got him with "big cash" – "[t]hey talking over 100."  *See* Exh. 3, Call A-420.  In another call that day, Hardy told a male using telephone number (860) 816-0855 that "Humpty . . . got caught with 200 cash . . . that I gave him."  *See* Exh. 3, Call A-464.  Hardy stopped using the A-Line soon thereafter.

On May 23, 2011, law enforcement initiated a wiretap on another telephone that Hardy was utilizing (the "B-Line").  In a call at approximately 7:19 a.m. on June 8, Hardy, utilizing the B-Line,

told a male utilizing (443) 944-5396 that by that night, he would have the male.  *See* Exh. 3, Call

B-1093.  Later that morning, law enforcement observed Hardy arriving at Enterprise Rental Car in

Salisbury, Maryland, in a Mercury Marquis that was being driven by Lavaughn Price; exiting the

Marquis and entering the Enterprise office; exiting the Enterprise office shortly thereafter with an

individual who appeared to be an Enterprise employee; and then walking over to and entering a

burgundy-colored Dodge Journey at approximately 11:27 a.m.  Hardy was subsequently observed

exiting the Enterprise parking lot in the Dodge Journey and driving to Route 50, on which he headed

westbound, and then driving northbound on Route 97 to Severn, Maryland.  *See* Report re June 8,

2011 Surveillance of Hardy-Jackson Meeting (Exhibit 10) at Bates 2756.

Hardy arrived in the parking lot of a Wal-Mart in Severn at approximately 1:58 p.m., and at

approximately 2:03 p.m., he pulled up next to a maroon 2002 Volkswagen Passat (the "Passat").

Surveillance observed Andrew Jackson walking from the direction of the Passat toward a Rite-Aid

Pharmacy located next to the Wal-Mart.  Hardy began driving toward Jackson, but Jackson gestured

with his hand, apparently redirecting Hardy in the opposite direction, after which both Jackson and

Hardy appeared to be using cellular phones and Hardy drove in the direction to which Jackson had

gestured.  At approximately 2:05 p.m., Jackson entered the Rite-Aid Pharmacy.  He exited at

approximately 2:09 p.m. and walked toward the Wal-Mart.  At approximately 2:10 p.m., Hardy

exited the Wal-Mart parking lot and he subsequently returned to Salisbury.  At approximately the

same time that Hardy departed the Wal-Mart parking lot, Jackson walked to the Passat, opened the

trunk and peered inside, closed the trunk, and drove the Passat out of the parking lot.  During

Jackson's departure from this area, he performed several "heat runs," driving in and out of store

parking lots.  Jackson then traveled northbound on Route 97 to I-695, then on to I-295 toward

Baltimore.  He was followed into Baltimore City, where he again performed heat runs.  *See* Exh. 10 at Bates 2756-59.

At approximately 3:53 p.m. on June 8 – less than two hours after he had met with Jackson in Severn – Hardy called Jamy Toadvine (who lived in Salisbury) to ask if Toadvine would be home at about 4:30.  Toadvine said he would.  *See* Exh. 3, Call B-1144.  In a call at approximately 5:09 p.m., Hardy told a male to meet him at Chesapeake Treasures and asked if another individual messed with "the girly" or "the hard," and the male said "the girl."  Hardy said he would give the person to whom he was speaking "four" and needed "11 apiece" – a phrase that law enforcement believed was a reference to four ounces of cocaine at a price of $1,100 per ounce.  *See* Exh. 3, Call B-1159.  At approximately 5:23 p.m., Hardy pulled into the parking lot of Chesapeake Treasures in the Dodge Journey, and he exited the vehicle and went inside.  At approximately 5:50 p.m., a white Pontiac G6 pulled up next to the Dodge Journey.  Hardy exited Chesapeake Treasures, opened the driver's-side door to the Journey, appeared to retrieve an item from the vehicle, and then walked over to the driver's-side door of the Pontiac and made an exchange through the window with the driver.  *See* Report re June 8, 2011 Surveillance of Meeting at Chesapeake Treasures (Exhibit 11) at Bates 2045-46.

On June 23, 2011, U.S. Magistrate Judge Victor H. Laws III signed a warrant authorizing the search of and seizure of items from Jackson's residence, 4408 Laplata Avenue, Apartment K, Baltimore, Maryland, and for the Passat.  *See* Search Warrants for 4408 Laplata and Passat and Supporting Documents (Exhibit 12).  On June 29, law enforcement officers, after knocking and announcing their presence at Jackson's residence with no response, made forced entry into the residence.  The officers observed that the bedroom doors were closed, that a hallway bathroom door

was slightly opened, and that Jackson was inside the bathroom. Jackson initially refused to exit the bathroom notwithstanding the officers' request, but he subsequently relented and was arrested. Agents positioned outside the residence observed another individual, Ranson Chandler, flee the residence from the window of a spare bedroom. Chandler threw a bag to the ground that contained $2,501 in U.S. currency, and he was apprehended in the adjacent parking lot. A Baltimore City narcotics-detection canine was called to the scene to perform a canine scan on the Passat and the residence, and the canine alerted on the Passat but not inside the residence. *See* Report re Execution of Warrant at 4408 Laplata (Exhibit 13). In searching the residence, law enforcement found a number of cellular telephones, $626 in U.S. currency in the master bedroom, and cocaine residue on the kitchen counter, as well as keys to the Passat. *See id.* at Bates 2751; Report re Acquisition of Evidence from 4408 Laplata (Exhibit 14); Lab Report and Property Sheet for Cocaine Seized from 4408 Laplata (Exhibit 15); Report re Search of Passat (Exhibit 16) at Bates 1180.

An initial search on the Passat was also conducted on June 29, and the vehicle was then more thoroughly searched the following day. During the search on June 30, Trooper First Class Howard Kennard located a hidden compartment under the rear seat of the car. Inside the compartment were two bags containing large amounts of U.S. currency. One bag contained $23,010 and the other bag contained $48,030, for a total of $71,040. *See* Exh. 16. Cocaine residue was also recovered from in and around the hidden compartment. *See* Report re Search of Passat's Compartment (Exhibit 17); Lab Report and Property Sheet for Ion Scan Environmental Blank Disk and Ion Scan Disk with Residue from Hidden Compartment (Exhibit 18). Also on June 29, 2011, Hardy was arrested following a meeting with Anthony Hardy, and the search of the car Maurice Hardy was driving resulted in the recovery of 1.027 kilograms of cocaine. *See* Report re Arrest of Hardy and Search

of Car (Exhibit 19); Lab Report and Property Sheet for Cocaine Seized from Hardy's Vehicle (Exhibit 20).  A search of Toadvine's residence on the same day resulted in the recovery of 82.4 grams of cocaine and 41.7 grams of heroin, among other things.  *See* Report re Evidence Acquired from Search of Toadvine's Residence (Exhibit 21); Lab Reports and Property Sheets for Heroin and Cocaine Seized at Toadvine's Residence (Exhibit 22).

Jackson is charged in this case with conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and a quantity of cocaine base, in violation of 21 U.S.C. § 846.  He has filed three Motions to Suppress Physical Evidence that collectively argue that the stop of the Accord was impermissible and the canine alert did not give rise to probable cause to search the Accord, *see* ECF ## 93 ("First Motion to Suppress"), 163 ("Second Motion to Suppress"), 164 ("Third Motion to Suppress"); a Motion to Suppress Derivative Use of Evidence Obtained from GPS Tracking Devices, ECF # 165 ("Tracker Motion"); and a Motion to Preserve Tangible Evidence, ECF # 92 ("Motion to Preserve").[5]  This Consolidated Response addresses those motions.

---

[5]To the extent that Jackson is pursuing motions filed by other defendants pursuant to his Motion to Adopt Motion of Other Defendant, ECF # 143, the government opposes such motions but, subject to contrary direction from the Court, does not intend to respond at length in advance of the motions hearing.  The government notes that Maurice Hardy's Preliminary Rule 12 Motions is a bare-bones, blanket challenge to the indictment and evidence in this case, *see* ECF # 36; Jackson was not intercepted on the wiretap of Hardy's telephone and therefore does not have standing to challenge the wiretap, *see Alderman v. United States*, 394 U.S. 165, 175-78 & n.9 (1969); and Jackson does not have standing to challenge the searches that are challenged in Nutter's motions, ECF ## 140-41, because Jackson has no known connection to the search locations at issue in those motions.  In addition, while Hardy filed a Motion to Sever, ECF # 41, Jackson has made no showing as to how *he* would be prejudiced without a severance, *cf. Zafiro v. United States*, 506 U.S. 534, 539 (1993) (court must determine if there "is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"; "[t]he risk of prejudice will vary with the facts in each case"), and it is not clear at this point which, if any, other defendants will proceed to trial.

## ARGUMENT

**I.      The Evidence Seized from the Accord Should Not Be Suppressed.**

Jackson's First, Second, and Third Motions to Suppress contend that the stop of the Accord on May 12, 2011, was not permissible and that the evidence seized from the Accord, as well as derivative evidence, including the items seized from Jackson's residence and the Passat on June 29 and 30, 2011, should be suppressed.  The Court should deny these motions for two reasons.  First, the evidence obtained prior to the stop of the Accord, including in particular the wiretap evidence and surveillance demonstrating that Hardy, Roberts, and Jackson had conducted a drug-related transaction shortly before Jackson was pulled over, provided law enforcement with probable cause to believe that a search of the Accord would result in the recovery of drug proceeds and/or other drug-related evidence.  Second, Cpl. Williams had probable cause to believe that the Accord's windows were tinted beyond the extent permitted by law and thus was permitted to conduct a stop of the Accord; the detention of Jackson through the time of the canine alert was justified both as part of the lawful traffic stop and by Cpl. Williams' reasonable articulable suspicion that criminal activity was afoot; and the canine's alert provided probable cause to search the Accord.  Moreover, because there would have been probable cause to search Jackson's residence and the Passat on June 29 and 30 irrespective of whether the Accord had been stopped and searched, the evidence seized from the residence and the Passat should not be suppressed even if the Court suppresses the evidence obtained from the search of the Accord.

A. **Intercepted communications and surveillance provided probable cause to search the Accord.**

To begin with, the evidence that law enforcement had obtained as of the time of the stop of the Accord provided probable cause to believe that a search of the Accord would result in the recovery of drug proceeds and/or other drug-related evidence. By early May 2011, investigators had developed sufficient evidence of Hardy's involvement in drug trafficking that they were able to obtain authorization to intercept communications over the A-Line. *See* Exh. 2. And communications intercepted in the first few days of that wiretap provided significant additional evidence of Hardy's involvement in drug trafficking. As set forth above, Hardy, in a conversation with Anthony Hardy on May 10, 2011, asked if Anthony Hardy had "any of them things all together" and said that the other thing was gone and that some people had said that it did not taste right; Anthony Hardy said that he might have one that is yummy; and Maurice Hardy said that he could probably do "three or four" if Anthony Hardy came across something that was "100." Exh. 3, Call A-114. The following day, Irving Polk sent Maurice Hardy a text message asking whether he could "get 15 for a stack a piece"; Hardy responded, "Yeah all the money up front"; and Polk then sent a text message stating, "My man want 9 but he says he been payin a stack and says he won't pay no more than 1050. I was gonna buy the other 6." Exh. 3, Calls A-202, A-204, A-206. In a call later that day, Hardy told Polk "that's what the numbers is, man," unless "you got the cash money up front," adding that others are paying 11 or 12. Exh. 3, Call A-219. The investigators in this case believed, based on their training and experience, that these communications were coded communications regarding the quality, quantities, and prices of narcotics.

Communications intercepted during the period from May 10, 2011, through May 12, 2011, also provided strong evidence that Hardy would soon be participating in one or more drug-related

transactions.  Maurice Hardy informed Anthony Hardy on May 10 that he was waiting on his people, and he told Anthony Hardy the following day that his people had just come through.  Exh. 3, Calls A-144, A-243.  On May 12, at approximately 12:20 p.m., Hardy informed Arnold Williams that he was meeting "Shorty" at that time; as soon as he met him, he was going to go to Jamy's (Toadvine's) to check it out; and he would get everything together and come right to Williams.  Williams and Hardy discussed Hardy's getting the "skizzy-wizzy" (scale), and Hardy asked if Williams needed "biz-ags" (bags), which Williams said he did.  Exh. 3, Call A-313.  Hardy then informed Polk, in a call at approximately 12:41 p.m., that he was going to give Polk "the 15 . . . for the 10-50" and told Polk to give him about 30 minutes.  Exh. 3, Call A-321.  These communications provided investigators with significant reason to believe that Hardy would soon be participating in narcotics transactions.[6]

Surveillance conducted by law enforcement on May 12, 2011, corroborated the above-described evidence that Hardy would be participating in drug transactions on that day and provided substantial evidence that the individual driving the Accord (later identified as Andrew Jackson) was involved in supplying Hardy with, and receiving payment in exchange for, those narcotics.  In particular, law enforcement observed Hardy leaving Toadvine's residence in a Ford Fusion rental car at approximately 1:20 p.m.  (The government anticipates that officers will testify at the motions hearing that they initially believed, based on Hardy's then-recent call with Polk, that Hardy was leaving Toadvine's residence to distribute narcotics to Polk.)  Surveillance followed Hardy to the

---

[6]It is of no moment whether Cpl. Williams was made aware of the content of the intercepted calls or even knew that the investigation included a wiretap.  It was enough that Cpl. Williams knew that there was a basis to stop and search the Accord.  *See United States v. Hensley*, 469 U.S. 221, 232-33 (1985) (finding that police could make a stop based on a flyer or bulletin issued by another police department and that the police making the stop need not know the exact basis for the reasonable suspicion for the stop).

parking lot of Chesapeake Treasures Seafood Shop in Salisbury, Maryland, where Hardy pulled up next to the Accord. Law enforcement officers also observed a light-colored Acura in the parking lot that was being driven by Austin Roberts. Following Hardy's arrival in the parking lot, Jackson was observed going to the trunk of the Accord, retrieving a package, and handing that package to Hardy. Hardy placed the package in the Ford Fusion, retrieved a shopping-style bag from the Fusion, opened the passenger-side door of the Accord, and put the bag in the Accord. After that, Hardy entered the passenger seat of the Acura being driven by Roberts. Hardy exited the car approximately one minute later, reentered his car, and all three vehicles left the parking lot. *See* Exh. 4 at Bates 2100-01.

This meeting, including in particular Jackson's receipt of a shopping bag from Hardy and placement of that bag in the Accord, in conjunction with the calls described above indicating that Hardy was planning to conduct drug transactions on May 12, provided law enforcement with significant reason to believe – surely rising to the level of probable cause – that drugs or drug-related evidence, such as narcotics proceeds, would be found in the Accord. *See United States v. Seymour*, 519 F.3d 700, 713 (7th Cir. 2008) (indicating that wiretapped calls provided probable cause to search the defendant's vehicle).[7] Cpl. Williams was accordingly permitted to stop and search the Accord, *see United States v. Ross*, 456 U.S. 798, 800, 825 (1982) (officers "who legitimately have stopped an automobile and who have probable cause to believe that contraband is concealed

---

[7]Because Cpl. Williams was permitted to search the Accord based on the wiretap and surveillance evidence, it follows *a fortiori* that he was permitted to stop the vehicle. *See United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988) ("law enforcement officers may stop an automobile to investigate a reasonable suspicion that its occupants are engaged in criminal activity").

somewhere within it . . . may conduct a search of the vehicle that is as thorough as a magistrate could authorize by warrant"), and Jackson's motions to suppress evidence obtained from the Accord should be denied.

**B.     The stop and search at issue would have been permissible even without the wiretap evidence.**

The traffic stop of the Accord, the detention of Jackson from the time of the traffic stop through the canine alert, and the subsequent search of the Accord would also have been permissible even without the wiretap and surveillance evidence.  In particular, the stop was permissible because Cpl. Williams had probable cause to believe that Jackson was committing a traffic infraction by driving a vehicle with windows that were tinted in excess of the legally permissible degree of tint. After that stop was made, the detention of Jackson through the time of the canine's alert was permissible (1) as part of the lawful traffic stop and (2) based on reasonable articulable suspicion that Jackson was engaged in criminal activity.  Once the narcotics-detection canine alerted to the Accord, law enforcement had probable cause to search the vehicle.  The evidence obtained as a result of the search of the Accord therefore should not be suppressed for these reasons as well.

**1.     The traffic stop of the Accord was supported by probable cause.**

Cpl. Williams was justified in stopping the Accord because he had probable cause to believe that the driver of the Accord had committed a traffic violation.  In *Whren v. United States*, 517 U.S. 806 (1996), the Supreme Court held that a traffic stop is reasonable (and thus constitutionally permissible) where a police officer has probable cause to believe a traffic violation has occurred, regardless of how minor the traffic offense may be.  *Id.* at 809-10; *United States v. Bullock*, 94 F.3d 896 (4th Cir. 1996) (stop of vehicle with cracked windshield traveling six miles-per-hour over posted speed limit was valid); *United States v. Jeffus*, 22 F.3d 554, 556-57 (4th Cir. 1994) (stop of

vehicle with cracked windshield and a broken taillight and headlight was justified); *United States v. Hassan-El*, 5 F.3d 726, 730 (4th Cir. 1993) (holding that as long as an officer has an objective basis to stop a vehicle, evidence of a more serious offense will not be suppressed based on the officer's subjective intent).  Here, Cpl. Williams had probable cause to believe that windows on the Accord were tinted beyond the legal limit.

Maryland law prohibits individuals from driving on any highway a vehicle that is equipped in violation of title 22.  *See* Md. Code, Transp. Art., § 22-101(a)(1)(iii); *see also* Md. Code, Transp. Art., § 27-101(a) (violation of § 22-101 is a misdemeanor).  With an exception not relevant here, section 22-406(i)(1)(i) of the Transportation Article prohibits a person from operating a passenger vehicle on a highway of the State if "there is affixed to any window of the vehicle any tinting materials added to the window after manufacture of the vehicle that do not allow a light transmittance through the window of at least 35%."[8]  In this case, Cpl. Williams believed based on his observation of the windows on the Accord and his training and experience that the Accord's windows did not permit the required light transmittance.  *See* Exh. 6 at Bates 2539.  Given that the windows have subsequently been inspected and that the left and right front windows, left and right wing windows, and the rear glass window all were found to permit less than 35% light transmittance, *see* Exh. 5, Cpl. Williams' belief was plainly justified.  Cpl. Williams therefore had probable cause to believe that the driver of the Accord was committing a traffic violation.

To be sure, Jackson is correct in asserting that "the mere fact that an automobile[']s windows are tinted does not give rise to a reasonable suspicion that there is a violation of" the pertinent

---

[8]Federal regulations require that windshields and front windows installed in passenger cars by automobile manufacturers transmit at least 70% of the light striking them.  The post-manufacture tinting of motor vehicle windows is regulated primarily at the state level.  *See State v. Williams*, 934 A.2d 38, 42 (Md. 2007).

statute.  First Motion to Suppress at 3.  But while the Maryland Court of Appeals has held that a stop

was impermissible where the officer "did *not* purport to determine whether the window appeared

to be *illegally* tinted, but only whether it was '*other than what normal windows would appear, a car*

*that did not have any kind of after-market tinting*,'" *State v. Williams*, 934 A.2d 38, 41 (Md. 2007)

(emphasis in original),  the court has also made clear that "an officer's observations may be the basis

for such a stop, if those observations truly suffice to give a reasonable articulable suspicion that one

or more windows are not in compliance with the statutory and regulatory requirements," *id.* at 47.

That is precisely the case here.  Unlike the officer in the *Williams* case, Cpl. Williams believed that

the tint on the windows of the Accord exceeded the legally permissible degree of tint based on his

observation of the windows on the Accord and his training and experience, including his prior

observations of vehicles with windows that were tinted beyond the legally permissible limit.  Cpl.

Williams was therefore permitted to conduct a traffic stop of the Accord.

> **2.  The detention of Jackson from the initiation of the traffic stop through the canine alert was permissible.**

The detention of Jackson from the initiation of the traffic stop through the narcotics-detection

canine's alert on the vehicle was permissible for two reasons: (1) the canine scan occurred during

the course of the lawful traffic stop and (2) Cpl. Williams had reasonable articulable suspicion that

Jackson was engaged in criminal activity.

### a.       The detention was permissible as part of the lawful traffic stop.

The detention of Jackson from the time of the traffic stop through the canine's alert was permissible in connection with the lawful stop of the Accord.   The length of the detention of a person stopped for a traffic violation is reasonable so long as it does not exceed the time necessary for the officer to address the violations or circumstances that resulted in the stop.   *See United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (traffic violation provides justification for officer to detain offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop); *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir. 1992).   It is "well-established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Farrior*, 535 F.3d 210, 217 (4th Cir. 2008); *see also United States v. Sullivan*, 138 F.3d 126 (4th Cir. 1998); *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007).   Courts have further explained that the maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision.   *United States v. Sharpe*, 470 U.S. 675 (1985) (point at which investigative detention escalates into arrest has no hard-and-fast time limit).

In the case at hand, Jackson pulled over into a gas station parking lot and then exited the Accord.   Cpl. Williams exited his patrol vehicle, approached Jackson, and requested Jackson's driver's license and registration.   After reentering the Accord, Jackson provided a change-of-address card identifying him as Frederick Williams of Baltimore, Maryland.   Cpl. Williams subsequently requested the registration an additional time, and Jackson provided it to Cpl. Williams.   *See* Exh. 6 at Bates 2539.   The video of the traffic stop shows that Cpl. Williams informed Jackson that Jackson had to get his license changed over (from Florida to Maryland) and that he was going to write

Jackson a warning.  Cpl. Williams then returned to his vehicle and provided Jackson's (false) information to a dispatcher.  While Williams was waiting to hear back from the dispatcher, DFC Richardson had Jackson exit the Accord, patted Jackson down, and conducted the canine scan. Shortly after the canine scan was completed, the dispatcher informed Cpl. Williams that the license Jackson had provided was valid in Florida.  *See* Exh. 8.  Aside from the canine scan, all of these events – including the relay of information from the dispatcher to Cpl. Williams, which took place after the canine scan was completed – were plainly incidents of a routine traffic stop.  The detention of Jackson from the time of the traffic stop through the canine's alert was therefore permissible as part of the lawful stop of the Accord.  *See Branch*, 537 F.3d at 335.

> **b.     The detention was also permissible because Cpl. Williams had reasonable articulable suspicion that Jackson was involved in illegal activity.**

The detention of Jackson from the time of the traffic stop to the canine's alert was also permissible because Cpl. Williams had reasonable articulable suspicion that Jackson was involved in illegal activity.  Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Under the reasonable suspicion standard, a "minimal level of objective justification" is required.  *Id.*  Reasonable suspicion is supported by "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity."  *Branch*, 537 F.3d at 336 (internal quotation marks omitted).  "Judicial review of the evidence offered to demonstrate reasonable suspicion must be commonsensical, focused on the evidence as a whole, and cognizant of both

context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Id.* at 337.

In this instance, Cpl. Williams observed that Accord's windows were tinted beyond the legal limit; Jackson exited the Accord after pulling over; Jackson's hands were noticeably trembling as he handed a change-of-address card to Cpl. Williams; Jackson had a difficult time removing his license from his wallet and his hands were still trembling when he handed the license to Cpl. Williams; and Cpl. Williams had to request Jackson's registration a second time before Jackson provided it to him.  In addition, Cpl. Williams smelled the overwhelming odor of air freshener – a common masking agent for the smell of narcotics – coming from the Accord.  *See* Exh. 6 at Bates 2539.  Taken together, these observations provided Cpl. Williams with several reasons to be suspicious that Jackson was engaged in illegal activity.

That law enforcement also had obtained the wiretap information described in the factual background section and section I.A above leaves no doubt that Cpl. Williams had reasonable articulable suspicion of criminal activity during the stop at issue.  *See United States v. Flores*, 571 F.3d 541, 545 (6th Cir. 2009) (calls intercepted on wiretap provided reasonable suspicion for vehicle stop); *United States v. Fletcher*, 237 Fed. App'x 805, 807 (4th Cir. 2007) (unpublished) (based on wiretapped call and surveillance, it "was reasonable for police to believe that the gun was located in the Mercedes"; "these circumstances were sufficient to cause a reasonable person to believe that criminal activity was afoot") (internal quotation marks omitted).  Indeed, there was *probable cause* to believe that criminal activity was afoot, as explained above.  *See Seymour*, 519 F.3d at 713 (indicating that wiretapped calls provided probable cause to search the defendant's vehicle).  Any

challenge to the detention of Jackson through the point in time at which the canine alerted is therefore without merit.

### 3.    The canine's alert provided probable cause to search the Accord.

Following the canine's alert, the officers were permitted to search the Accord.  The Fourth Circuit has made clear that a positive alert for the presence of controlled substances by a well-trained narcotics-detection canine provides probable cause for a search.  *See Jeffus*, 22 F.3d at 556-57 (use of drug dog not itself a search, but fact that the dog alerts constitutes probable cause to search); *see also United States v. Carter*, 300 F.3d 415, 422 (4th Cir. 2002) (positive alert at vicinity of trunk area of vehicle by canine provided probable cause to search trunk of car); *United States v. Allen*, 159 F.3d 832, 839 (4th Cir. 1998) (collecting cases).[9]  Here, Fogy, a well-trained narcotics-detection canine, did in fact alert on the Accord.  *See* Exhs. 7-8.

To the extent that the Defendant contests that Fogy is a well-trained narcotics-detection canine, *see* Second Motion to Suppress at 2, his argument is plainly without merit.  To begin with, Fogy has been trained and certified to detect narcotics.  *See* Canine Certification and Training Records (Exhibit 23); *see also* Exh. 9 at Bates 2570-73.  Such training and certification, without more, are sufficient to establish that a canine is well trained such that its alert to the presence of narcotics gives rise to probable cause.  *See, e.g.*, *United States v. Koon Chung Wu*, 217 Fed. App'x 240, 245 (4th Cir. 2007) (unpublished) ("evidence of [the canine's] training and certification was enough by itself to establish [the canine's] reliability so that his positive alerts for controlled substances established probable cause for" the searches at issue); *United States v. Stanley*, 4 Fed.

---

[9]*Jeffus*'s status as controlling authority is of course not affected by the Florida Supreme Court's decision in *Harris v. State*, 71 So. 3d 756 (Fla. 2011), or the Supreme Court's grant of a writ of *certiorari* in that case, *Florida v. Harris*, 132 S. Ct. 1796 (2012).  *See* Second Motion to Suppress at 2.

App'x 148, 150 (4th Cir. 2001) (unpublished) ("Assuming, without deciding, that some evidence is necessary, we find Officer Amoia's testimony regarding his familiarity with the dog and its training sufficient to establish the dog's reliability in this case."); *United States v. Robinson*, 390 F.3d 853, 874 (6th Cir. 2004) ("[A]fter it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications.") (internal quotation marks omitted); *United States v. Ludwig*, 641 F.3d 1243, 1251 (10th Cir. 2011) (noting that "courts typically rely on the dog's certification as proof of its reliability").  Moreover, records from Fogy's training and his record in the field demonstrate that Fogy is a skilled narcotics-detection canine.  *See* Exh. 23 at Bates 2549-57; Exh. 9 at Bates 2572-73.

Thus, Fogy's alert provided probable cause to search the Accord.  And given that the Accord is an automobile, the officers were permitted to search the Accord based upon that probable cause. *E.g.*, *United States v. Ross*, 456 U.S. 798, 800, 825 (1982) (holding that officers "who legitimately have stopped an automobile and who have probable cause to believe that contraband is concealed somewhere within it . . . may conduct a search of the vehicle that is as thorough as a magistrate could authorize by warrant"); *United States v. Sakyi*, 160 F.3d 164,168-69 (4th Cir. 1998) (canine alert on vehicle for the presence of controlled substances provides sufficient probable cause to search the vehicle and its occupants).  Accordingly, Jackson's challenge to the probable cause for the search of the Accord, as well as his other challenges to the search of the Accord, should be denied.

**C.      There would have been probable cause to search Jackson's residence and the Passat even if the Accord had not been stopped and searched.**

Even assuming *arguendo* that the stop and search of the Accord were impermissible, the Court should not suppress the evidence seized from Jackson's residence or the Passat on June 29 and 30, 2011.  When tainted evidence is used to obtain a search warrant, the search warrant should not be invalidated if there is enough untainted information in the affidavit to support a finding of probable cause.  *See, e.g.*, *United States v. Wright*, 991 F.2d 1182 (4th Cir. 1993); *United States v. Gillenwaters*, 890 F.2d 679 (4th Cir. 1989); *United States v. Whitehorn*, 813 F.2d 646, 649 (4th Cir. 1987).  Here, even without the evidence seized from the Accord, the affidavit in support of the warrants for Jackson's residence and the Passat plainly provided probable cause to believe that a search of those locations would result in the recovery of drugs or drug-related evidence.

In particular, the affidavit explains that calls were intercepted over the A-Line on May 11, 2011, that led investigators to believe that a drug transaction was going to take place; on May 12, 2011, Hardy met with Jackson and Roberts, Jackson gave a package from his vehicle to Hardy, and Hardy placed a package in Jackson's vehicle; Hardy spoke later that day with an individual who, apparently requesting a quantity of narcotics, said he needed "5"; calls were intercepted on June 8, 2011, that led investigators to believe that Hardy would be obtaining a new supply of narcotics; Hardy was observed later that day in Severn, Maryland, in proximity to Jackson and the Passat he was utilizing; Jackson was observed performing "heat runs" as he left this area; and Hardy met with several individuals later that day in a manner that is consistent with drug trafficking.  *See* Exh. 12 at Bates 1533-34, 1536, 1538-41. Jackson, in short, was twice observed apparently supplying Hardy with narcotics.  These observations provided law enforcement with significant reason to believe that Jackson was involved in the distribution of narcotics and had used the Passat (which Jackson was

driving at one of his meetings with Hardy) in connection with this illegal activity.  Given that it is reasonable to infer that individuals involved in drug dealing will store evidence of their illegal activity in their residences and vehicles,[10] this evidence provided substantial reason to believe that the search of the residence and Passat would result in the recovery of pertinent evidence.  While the fact that U.S. currency was found in the Accord bolsters this conclusion, it is not essential to the conclusion.  As such, the evidence from Jackson's residence and the Passat should not be suppressed even if the evidence from the Accord is suppressed.  *See, e.g.*, *Whitehorn*, 813 F.2d at 649.

## II.     The Evidence Derived from Use of the Trackers Also Should Not Be Suppressed.

Jackson has also filed a motion to suppress derivative evidence obtained as a result of the use of tracking devices on the Ford Fusion and Mercury Mariner that Maurice Hardy utilized.  *See* Tracker Motion.  During the course of the investigation in this case, law enforcement obtained warrants for the use of tracking devices on the Fusion and the Mariner, as well as other vehicles, and affixed tracking devices to and tracked these vehicles.  Law enforcement, without a warrant, also affixed tracking devices to the Dodge Journey that Hardy utilized and the Passat that Jackson

---

[10] *See, e.g.*, *United States v. Whitner*, 219 F.3d 289, 298 (3d Cir. 2000) ("The rationale underlying [such] cases is that evidence associated with drug dealing needs to be stored somewhere, and that a dealer will have the opportunity to conceal it in his home.  After all, a dealer logically could conclude that his residence is the best, and probably the only, location to store items such as records of illicit activity, phone books, address books, large amounts of cash, assets purchased with proceeds of drug transactions, guns to protect drugs and cash, and large quantities of drugs to be sold."); *United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999) (reasonable to suppose that drug dealer stored evidence of dealing at home, even though no drug trafficking was observed to occur there); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir.1999) ("[I]n issuing a search warrant, a magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept . . . and . . . in the case of drug dealers evidence is likely to be found where the dealers live.") (emphasis omitted); *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994) (observations of drug trafficking occurring away from the dealer's residence, coupled with officer's statement in his affidavit that drug dealers often store evidence of drug dealing in their residences, provided probable cause for search of dealer's house); *United States v. Cruz*, 785 F.2d 399, 406 (2d Cir. 1986) (facts permitted magistrate to find probable cause for search of drug dealer's apartment, even though he was not seen using the apartment).

utilized.  Law enforcement used these tracking devices both prior to and following Jackson's meeting with Hardy on June 8, 2011.

Jackson's argument for suppression of the evidence obtained from the use of tracking devices on the Fusion and Mariner, as well as any argument for suppression of the evidence obtained from the use of tracking devices on the Journey and the Passat, should be rejected.  To the extent that Jackson challenges the use of trackers on vehicles that he was not driving, he does not have standing to challenge the use of the trackers.  To the extent that Jackson does have standing, his challenge to the use of trackers on the Fusion and the Mariner fail because the trackers on those vehicles were installed and utilized pursuant to valid warrants.  Further, Jackson's Tracker Motion should be denied because the trackers in this case were installed and used prior to the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), and the officers utilizing the trackers acted in good faith.  Any evidence obtained through the use of the trackers, moreover, would inevitably have been or was independently discovered.

### A.    Jackson does not have standing to challenge the use of the trackers on the Ford Fusion, Mercury Mariner, or Dodge Journey.

To begin with, Jackson's Tracker Motion fails to the extent that it challenges the use of trackers on the Ford Fusion, Mercury Mariner, and Dodge Journey, because Jackson does not have standing to challenge searches of those vehicles.  In order to challenge the legality of a search, a defendant bears the burden of proving that he has a reasonable expectation of privacy in the place or item that was searched.  *United States v. Padilla*, 508 U.S. 77, 81 (1993) ("It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search and seizure.") (emphasis in original); *Rusher*, 966 F.2d at 874; *United*

*States v. Taylor*, 857 F.2d 210, 214 (4th Cir. 1988) ("Fourth Amendment rights are . . . personal rights."). As Jackson neither utilized nor had a possessory interest in the Ford Fusion, Mercury Mariner, or Dodge Journey – Maurice Hardy was the individual who was driving these vehicles – Jackson plainly cannot meet that burden with respect to these vehicles.

> **B.      The trackers on the Ford Fusion and Mercury Mariner were installed and utilized pursuant to valid warrants.**

Jackson's challenges to the trackers on the Ford Fusion and Mercury Mariner also fail because those devices were affixed and utilized pursuant to valid warrants signed by United States Magistrate Judge Mary Pat Thynge of the District of Delaware. *See* Tracking Warrants for Ford Fusion and Mercury Mariner and Supporting Documents (Exhibits 24-25). The affidavits in support of those warrants describe surveillance of Hardy operating the Fusion and the Mariner, apparently drug-related calls between Hardy and other individuals, and surveillance of apparent drug transactions that Hardy conducted while utilizing the Fusion and the Mariner, as well as the seizure of $164,105 from the Accord after Hardy's meeting with Jackson. Exh. 24 at Bates 2514-16; Exh. 25 at 2525-29. This and other information set forth in the affidavits surely provided probable cause to believe that the use of tracking devices on the Fusion and the Mariner would permit law enforcement to obtain evidence regarding the distribution of narcotics. Moreover, even if the Court were to conclude that the tracking warrants were not supported by probable cause, the Court should nevertheless reject the Defendant's motion to suppress evidence obtained as a result of the use of these trackers because it plainly was reasonable for law enforcement officers to rely in good faith on the tracking warrants. *See Leon*, 468 U.S. 897, 922-23 (1984). Jackson's motion to suppress evidence obtained from the use of trackers on the Fusion and the Mariner should therefore be denied for this reason as well.

### C.   Suppression is not appropriate because the trackers in this case were utilized prior to the *Jones* decision and the officers acted in good faith.

Jackson's Tracker Motion should also be denied because the tracker usage at issue took place prior to the *Jones* decision.  Approximately 19 years before its decision in *Jones*, the Supreme Court, in *United States v. Knotts*, 460 U.S. 276 (1983), rejected a Fourth Amendment challenge to the use of a beeper that had been placed in a container, allowing law enforcement to monitor the location of the container.  *Id.* at 285.  In support of that holding, the Court explained that "a person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another."   *Id.* at 281 (internal quotation marks and alterations omitted).  Notwithstanding that holding, the Supreme Court in *Jones* held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movement, constitutes a 'search'" within the meaning of the Fourth Amendment. 132 S. Ct. at 949.  In reaching that conclusion, the Court rejected the argument – which had been accepted by other courts, including the Maryland Court of Special Appeals, *Stone v. State*, 941 A.2d 1238, 1249-51 (Md. Ct. Spec. App. 2008) – that *Knotts* controlled the outcome of the question presented.  The Court distinguished that case on the ground that Knotts had not challenged the installation of the beeper used in that case.  *Jones*, 132 S. Ct. at 951-52.

Assuming *arguendo* that under *Jones* the installation and use of the trackers in this case violated the Fourth Amendment,[11] however, exclusion of the evidence obtained from those trackers

---

[11]A finding that the installation and use of the trackers constituted warrantless searches or searches conducted pursuant to deficient warrants would not necessarily lead to the conclusion that the installation and use of the trackers violated the Fourth Amendment.  Automobiles generally may be searched absent a warrant if there is probable cause to believe that they contain contraband, *see generally Carroll v. United States*, 267 U.S. 132, 160-62 (1925); and there was reason to believe, at least at some points in time, that Jackson's and Hardy's vehicles contained contraband (as well as probable cause to believe that the tracking of those vehicles would result in

would not be the appropriate remedy.  The purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones.  *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011).  Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free," a court must find that the benefits of deterrence outweigh the costs before excluding evidence obtained in violation of the Fourth Amendment.  *Herring v. United States*, 555 U.S. 135, 141 (2009) (internal quotation marks omitted); *accord id.* ("[T]he exclusionary rule is not an individual right and applies only where it results in appreciable deterrence.") (internal quotation marks and alterations omitted); *Davis*, 131 S. Ct. at 2427 ("For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.  Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort.").  Thus, to trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.  *Herring*, 555 U.S. at 144.  Suppression may therefore be warranted to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence, *id.*; but "when the police act with an objectively reasonable good-faith belief that their conduct is lawful," "the deterrence rationale loses much of its force, and exclusion cannot pay its way," *Davis*, 131 S. Ct. at 2427-28 (internal quotation marks omitted).

The Court's decision in *Davis* is particularly instructive here.  *Davis* presented the question whether the exclusionary rule applied to a search that was permissible under binding Eleventh

---

the recovery of evidence of illegal activity).  Hardy's departure from Salisbury to meet with Jackson immediately after renting the Dodge Journey arguably presented a further exigency justifying a warrantless search, as law enforcement would not have had an opportunity to affix a tracking device to the Dodge Journey between the time of Hardy's rental of that vehicle and his June 8, 2011 meeting with Jackson.

Circuit precedent at the time it was conducted but was subsequently determined to be unconstitutional under the Supreme Court's decision in *Arizona v. Gant*, 556 U.S. 332 (2009). *Davis*, 131 S. Ct. at 2428.  The Court held that it did not.  "Although the search turned out to be unconstitutional under *Gant*," the Court explained, "all agree that the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way"; "this acknowledged absence of police culpability doom[ed]" the suppression claim.  *Id.*  The Court added that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system," and that the conduct of the officers in that case "was neither of these things."  *Id.* (internal quotation and alteration marks omitted).

Similarly here, at the time of the installation and use of the tracking devices at issue, there was no controlling legal precedent that precluded the warrantless use of a tracking device.  On the contrary, the Maryland Court of Special Appeals had relied on the Supreme Court's decision in *Knotts* to conclude that police did not need to obtain a warrant in order to install a tracking device on the exterior of a vehicle or to monitor the movement of that vehicle on public roads.  *Stone*, 941 A.2d at 1249-51.  Several federal courts of appeals agreed with the conclusion that the warrantless installation and use of a GPS tracking device was permissible.  *See United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010); *United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010); *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007).  *But see United States v. Maynard*, 615 F.3d 544 (D.C. 2010).  In light of this case law, the officers in this case plainly acted reasonably and in good faith when they used tracking devices without a warrant (or relied on a deficient warrant).

This conclusion is consistent with that of several decisions since the issuance of *Jones* that have found the good-faith exception applicable to pre-*Jones* use of GPS trackers. *See United States v. Amaya*, No. 11-4065-MWB, 2012 U.S. Dist. LEXIS 50151, at *18 (N.D. Iowa Apr. 10, 2012), *rev'd in part on other grounds*, 2012 U.S. Dist. LEXIS 60391 (N.D. Iowa May 1, 2012) (evidence collected from GPS devices not subject to exclusionary rule because good-faith exception applies); *United States v. Leon*, No. 09-452-JMS, 2012 U.S. Dist. LEXIS 42737, at *10-17 (D. Haw. Mar. 28, 2012) (applying good-faith exception to pre-*Jones* use of GPS tracker); *United States v. Luna-Santillanes*, No. 11-20492, 2012 U.S. Dist. LEXIS 40532, at *27 n.5 (E.D. Mich. Mar. 26, 2012) (stating in dicta that it would find "persuasive" government's argument that the good-faith exception should be applied to pre-*Jones* use of GPS trackers); *United States v. Nwobi*, 2012 WL 769746, at *2-4 (C.D. Cal. Mar. 7, 2012) (exclusionary rule does not apply to use of GPS trackers in light of *Davis*). Indeed, in *United States v. Stephens*, Crim. No. JKB-11-447 (D. Md. 2012) (Bredar, J.), a court in this district held that in light of the good-faith exception set forth in *Davis*, the exclusionary rule does not apply to the pre-*Jones* use of GPS trackers in the District of Maryland.[12]  Accordingly, the Court should find that the good-faith exception applies and that suppression of the evidence obtained from the use of trackers in this case would therefore be unjustified. *See Davis,* 131 S. Ct. 2419; *Herring,* 555 U.S. 135.

> **D.     The evidence obtained from the trackers was independently obtained or would inevitably have been obtained.**

Moreover, the vast bulk of the information obtained from the use of the trackers should not be suppressed because it would inevitably have been discovered and/or was discovered

---

[12]The government intends to provide a transcript from the motions hearing in *Stephens* at or before the motions hearing in this case.

independently of the tracker usage.  As a general matter, improperly obtained evidence may be admitted if the government can establish by a preponderance of the evidence that the information sought would ultimately or inevitably have been discovered by lawful means.  *See Nix v. Williams*, 467 U.S. 431, 444 (1984).  Similarly, illegally obtained evidence is admissible if it is discovered through a source independent of the illegality.  *See Murray v. United States*, 487 U.S. 533, 537 (1988).

In this case, officers used the tracking devices as an aid to their visual surveillance.  Had the tracking devices not been used, the officers still would have conducted surveillance and still would have made many of the observations that they in fact made.  In driving to Severn, Maryland, on June 8, 2011, for instance, Hardy used relatively well-traveled roads, and he was not driving in a particularly erratic manner.  The officers accordingly would have been able to maintain their surveillance on Hardy through the time of his meeting with Jackson even if a tracking device had not been affixed to Hardy's vehicle.  Likewise, the officers conducting surveillance on Jackson after this meeting maintained or could have maintained visual surveillance on Jackson's vehicle until he began making heat runs in Baltimore, Maryland.  Accordingly, the officers' observations of these events, as well as their observations at any other time they were conducting surveillance and maintained or could have maintained visual surveillance of a target vehicle, should not be suppressed.

## III.    Jackson's Motion to Preserve Should Be Denied as Moot.

Jackson has also moved the Court to order the government to preserve and to make available tangible evidence.  *See* Motion to Preserve.  As the government has preserved pertinent evidence in this case and will, upon request, make this evidence available for inspection by defense counsel

at a mutually convenient time, the government believes that Jackson's Motion to Preserve should be denied as moot.

## CONCLUSION

For the reasons set forth above, Jackson's Motions to Suppress, Tracker Motion, and Motion to Preserve should be denied.

Respectfully submitted,

Rod J. Rosenstein
United States Attorney

By: _____/s/_____
        Joshua L. Kaul
        Assistant United States Attorney

Served electronically on defense counsel via ECF