IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

AUSTIN ROBERTS, III,

*Defendant*.

Criminal Action No. ELH-11-0358

**MEMORANDUM OPINION**

Defendant Austin Roberts, III is currently serving a 228-month sentence (ECF 383) for the offense of conspiracy to distribute and possess with intent to distribute one kilogram or more of heroin, five kilograms or more of cocaine, and a quantity of cocaine base, in violation of 18 U.S.C. § 846. The sentence dates to December 4, 2012. ECF 370 at 1; ECF 606-5 at 2. According to Roberts's Inmate Profile, he has a projected release date of August 24, 2029. ECF 606-9 at 1.

Roberts has filed a pro se motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), based on his purported vulnerability to COVID-19 or, in the alternative, a request for sentence reduction under Section 404 of the First Step Act. *See* ECF 591. His motion is supported by two exhibits. ECF 591-3; ECF 591-4. Through appointed counsel, Roberts filed a supplemental memorandum. ECF 604 (the "Supplemental Memorandum").[1] It is supported by twelve exhibits. ECF 606. I shall refer to ECF 591 and 604 collectively as the "Motion."

The Government opposes the Motion. ECF 616 (the "Opposition"). The Opposition is supported by three exhibits. *See* ECF 616-1; ECF 616-2; ECF 616-3. Roberts replied. ECF 619 (the "Reply").

---

[1] By letter of August 27, 2020, the Office of the Federal Public Defender ("FPD") declined to represent Mr. Roberts. ECF 593. Mr. Roberts filed a motion for appointment of counsel, docketed on February 17, 2021. ECF 596. Thereafter, counsel was appointed to represent Mr. Roberts. ECF 599.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall grant the Motion, in part. In particular, I shall reduce Roberts's sentence to 175 months of imprisonment. *See* ECF 606-5.

## I. Factual Background

Roberts and two others were indicted on June 29, 2011, and charged with drug conspiracy. ECF 1. A Superseding Indictment was filed on September 14, 2011, naming Roberts and eight others. ECF 44. In particular, Roberts was charged in Count One with conspiracy to distribute and possess with intent to distribute one kilogram of heroin, five kilograms or more of cocaine, and cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1).

On May 10, 2013, Roberts entered a plea of guilty to Count One. ECF 329; ECF 330 (Plea Agreement). Of significance here, the plea was entered pursuant to Fed. R. Crim. P. 11(c)(1)(C) ("C plea"), by which the parties agreed to a sentence of 228 months of imprisonment (19 years) as the appropriate disposition of the case. *Id.* ¶¶ 5, 10; *see also* ECF 369 (Transcript of proceedings of May 10, 2013). After deductions for acceptance of responsibility, Roberts had a final offense level of 34. *See* ECF 370 (Presentence Report, "PSR"), ¶ 25.

The Plea Agreement contained a stipulated Statement of Facts. ECF 330 at 9-10. Notably, Roberts agreed that he conspired to distribute "over 50 kilograms of cocaine and a kilogram of heroin," as well cocaine base. *Id.* at 9. And, in the Plea Agreement, Roberts waived his right to appeal, except as to any sentence in excess of 19 years of imprisonment. *Id.* ¶ 14.

The transcript of the Rule 11 proceeding is docketed at ECF 545. It reflects that the prosecution recounted, *inter alia*, that between 2007 and December 2012, Roberts conspired to distribute, distributed, and directed the distribution "of well over 50 kilograms of cocaine and a kilogram of heroin." *Id.* at 40; *see also* ECF 330 at 9. In addition, the conspiracy involved an

unspecified quantity of cocaine base. *Id.* During the investigation, phone calls were intercepted, search warrants were executed, Roberts used several false identities, and he twice fled from law enforcement to avoid apprehension. ECF 545 at 40-44.

At the guilty plea proceeding, while under oath (*id.* at 6), Roberts acknowledged the accuracy of the government's factual summary. *Id.* at 44. He also admitted that he had committed the crimes summarized by the government. *Id.*

The Presentence Report was docketed on July 16, 2013. ECF 370. Under the equivalency table found in § 2B1.1 of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), Application Note 8(D), the marijuana equivalent for the agreed drug quantity amounted to 11,000 kilograms. *Id.* ¶ 17. Under U.S.S.G. § 2D1.1(c)(2), this gave rise to a base offense level of 36. *Id.*

However, ¶ 25 of the PSR reflects a career offender designation under U.S.S.G. § 4B1.1. Therefore, Roberts's offense level increased to 37. And, after three deductions for acceptance of responsibility under U.S.S.G. § 3E1.1 (*id.*¶¶ 23, 26), Roberts had a final offense level of 34. *Id.* ¶ 27.

In addition, the PSR reflected a total of 11 criminal history points, which equated to a criminal history category of V. *Id.* ¶ 48. However, based on the career offender designation, the defendant's criminal history category was increased to VI under U.S.S.G. § 4B1.1. *Id.* ¶ 49.

The career offender designation was based on two prior felony drug convictions. In particular, in 1995 Roberts was convicted in the Circuit Court for Wicomico County, Maryland, Case 95CR0051, of Felonious Possession of Cocaine. *Id.* ¶ 39. The PSR indicates that, according to the charging instrument, "the defendant possessed cocaine in sufficient quantity to reasonably indicate under all circumstances an intent to distribute." *Id.* ¶ 40. Roberts received a 14-year sentence, with all but four years suspended, followed by probation. *Id.*¶ 39. He later violated his

probation and received a 10-year sentence, consecutive to the five-year sentence imposed in Case 97CR0587, for the offense of Reckless Endangerment, as referenced in ¶¶ 41 and 42 of the PSR. *See id.* ¶ 39.

The second qualifying predicate was a 1999 conviction in Case 02-K-99-000326, in the Circuit Court for Anne Arundel County, for the offense of possession of CDS with intent to distribute. *Id.* ¶ 43. Roberts received a sentence of two years' imprisonment. *Id.*; *see also id.* ¶ 44.

By statute, Roberts faced a mandatory minimum term of imprisonment of 10 years, with a maximum term of imprisonment of life, under 21 U.S.C. § 841(b)(1)(A). *See* ECF 330, ¶ 3; ECF 370, ¶ 57. As a career offender, with a final offense level of 34 and a criminal history category of VI, the advisory Guidelines called for a period of incarceration ranging from 262 to 327 months. ECF 370, ¶ 58. But, in the absence of a career offender designation, Roberts would have had a final offense level of 33, and a criminal history category of V, with Guidelines calling for a period of incarceration ranging from 210 to 262 months.

Sentencing was held on August 9, 2013. ECF 382. At the time, Roberts was 37 years old. ECF 370 at 1. The sentencing transcript is docketed at ECF 399. At sentencing, the government described the case as "serious," noting that it involved "a massive amount of drugs . . . ." *Id.* at 7. Roberts allocuted, asking the Court to "go along with [his] plea . . . ." *Id.* at 11.

In accordance with the terms of the C Plea, the Court imposed the agreed upon term of imprisonment of 228 months. *See* ECF 383 (Judgment); ECF 384 (Statement of Reasons). The sentence of 228 months was well below the career offender Guidelines range and towards the low end of the non-career offender Guidelines range.

No appeal was noted. However, Roberts subsequently filed a post-conviction petition under 28 U.S.C. § 2255. *See* ECF 405. He alleged, *inter alia*, ineffective assistance of counsel in

regard to the career offender designation.  By Memorandum Opinion (ECF 574) and Order (ECF 575) of December 16, 2019, I denied the post-conviction petition.

Roberts submitted a request for Compassionate Release to the Warden. ECF 591-1. The Warden denied Roberts's request. ECF No. 591-1. The Motion followed.

In his Motion, Roberts asserts that "extraordinary and compelling reasons exist to grant relief in light of Roberts' medical conditions carrying a 'high risk' for developing serious illness or death if infected with COVID-19." ECF 591 at 3; ECF 604 at 3. In particular, Roberts has been diagnosed with prediabetes, "Chronic Embolism," "thrombosis of vein," and "Hypertension." ECF 591 at 11-13.

Further, Roberts asks the Court to reduce his sentence because, if he were sentenced today, he would no longer qualify as a career offender under U.S.S.G. § 4B1.1. ECF 604 at 10. This is because the underlying conspiracy offense is no longer a qualifying offense, in light of *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019).  Further, Roberts claims that, under U.S.S.G. § 4B1.2(b), his conviction for felonious possession of CDS would not qualify as a career offender predicate. *Id.*

The government agrees that Roberts would not qualify as a career offender under today's sentencing framework.  ECF 616 at 6.

Roberts also contends that his base offense level would be 34 under § 2D1.1(c)(3), not 36. ECF 604 at 10.  And, after deductions for acceptance of responsibility, he claims he would have a final offense level of 31.  *Id.* The government does not comment on Roberts's claim that his final offense level would be 31 if he were not a career offender.  But, it seems to concede the point. *See* ECF 616 at 29.

5

In reviewing § 2D1.1(c)(3), Roberts is correct in asserting that his non-career offender base offense level would have been 34.  When converting the controlled substances for which he was convicted into an equivalent amount of marijuana, the result is 11,000 kilograms.  This yields a base offense level of 34 under § 2D1.1(c)(3).

After deductions for acceptance of responsibility, the defendant would have had a final offense level of 31 and a criminal history category of V. The corresponding Guidelines call for a sentence ranging from 169 to 210 months of imprisonment. *See* U.S.S.G. §§ 2D1.1, 2D1.1(c)(3), 3E1.1(a), 3E1.1(b).  This is in contrast to the career offender Guidelines range of 262 to 327 months of imprisonment.  Roberts asserts that this change constitutes an "extraordinary and compelling" circumstance justifying compassionate release. ECF 604 at 10.

However, the government contends that "such a disparity does not rise to the level of 'extraordinary and compelling reason' for compassionate release." ECF 616 at 6.

Alternatively, Roberts argues that he is eligible for a reduced sentence pursuant to Section 404 of the First Step Act. ECF 604 at 13-15. According to Roberts, he was convicted of "covered offenses" under Section 404 and "the statutory penalties for these statutes were modified by Section 2 of the Fair Sentencing Act." ECF 604 at 13.  Due to the change in the sentencing law, discussed *infra*, Roberts asks this Court to reduce his sentence pursuant to Section 404.

In its Opposition, the government contends that the relevant date for Section 404 eligibility is the date of *sentencing,* not the date of the conviction. ECF 616 at 19. Because Roberts was sentenced on August 9, 2013, more than three years after the effective date of the Fair Sentencing Act of 2010, the Government asserts that Roberts's sentence "was already imposed in accordance with the Fair Sentencing Act's amended quantity thresholds." *Id.*  Additionally, the government argues that Roberts is not entitled to Compassionate Release because COVID-19 does not pose a

substantial risk to him.  ECF 616 at 16.  The government also argues that the § 3553(a) factors weigh against any reduction in Roberts's sentence.  *Id.* at 32.

## II.  Legal Standards

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

The Motion invokes both the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i), and § 404 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194. I address each, in turn.

### A.  Compassionate Release

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 30 F.4th at 194. This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x

862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. No. 115-391, 132 Stat. 5194 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021); *see also Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the court must find that (1) "extraordinary and compelling reasons" warrant a reduction of the sentence; (2) the sentence reduction is "consistent" with applicable policy statements issued by the Sentencing Commission; and (3) on balance, the factors set forth in 18 U.S.C. § 3553(a) warrant a reduction of sentence.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169. But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[2]  In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States*

---

[2] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

*v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply here.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  And, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to the defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also United States v. Brice*, No. 21-6776, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam); *Hargrove*, 30 F.4th at 194-95.  Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized."  *Hargrove*, 30 F.4th at 197.  Notably, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons.  *United States v. Harris*, No. 21-6781, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release."  *United States v. Davis*, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence

reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required'" from the court.  *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court ruled, in the context of § 404(b) of the First Step Act, that, when raised by the parties, the district court is obligated to consider intervening changes in the law and factual developments.  *Id.* at 2396; *see Brice*, 2022 WL 3715086, at *2.

In sum, there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release.  Nevertheless, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194.  And, as mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Concepcion*, 142 S. Ct. at 2396; *Jenkins*, 22 F.4th at 169.

Nevertheless, the defendant, as the movant, bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020).  And, compassionate release is a "rare" remedy.  *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As indicated, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C.

§ 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.  And, "the court must provide an explanation sufficient 'to allow for

meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190).

### B.  The 2010 Fair Sentencing Act and The 2018 First Step Act

Section 3582(c)(1)(B) of 18 U.S.C. provides: "The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –...(B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute...." Modification is permitted for a defendant who was "sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission...." 18 U.S.C. § 3582(c)(2); *see United States v. Collington*, 995 F.3d 347, 353 (4th Cir. 2021) (noting that " § 3582(c)(2) permits defendants to move for a reduced sentence based on retroactive amendments to the Guidelines"); *United States v. Smalls*, 720 F.3d 193, 195-96 (4th Cir. 2013).

As mentioned, in December 2018 Congress enacted the First Step Act of 2018. *See McCoy*, 981 F.3d at 276. Section 404 of the 2018 FSA, 132 Stat. at 5222, 21 U.S.C. § 841, expressly "makes retroactive certain provisions of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010)." *Jackson*, 952 F.3d at 495; *see Concepcion*, 142 S. Ct. at 2397; *United States v. Lancaster*, 997 F.3d 171, 173 (4th Cir. 2021); *Collington*, 995 F.3d at 352; *Chambers*, 956 F.3d at 669-70; *United States v. Gravatt*, 953 F.3d 258, 260 (4th Cir. 2020); *United States v. Wirsing*, 943 F.3d 175, 177-180 (4th Cir. 2019); *United States v. Venable*, 943 F.3d 187, 188-89 (4th Cir. 2019). In particular, the 2018 FSA authorizes the modification of a previously imposed sentence for a defendant affected by the statutory changes to the penalty ranges for crack cocaine offenses. *See, e.g.*, *Jackson*, 952 F.3d at 495; *see United States v. Foster*, ___ Fed. App'x ___, 2022 WL 2826184, at *1 (4th Cir. July 20, 2022) (per curiam); *United States v. McDonald*, 986 F.3d 402, 408-09 (4th Cir. 2021).

The Fair Sentencing Act of 2010 ("2010 FSA"), which took effect on August 3, 2010, "reduced the statutory penalties for cocaine base offenses" in order to "alleviate the severe sentencing disparity between crack and powder cocaine." *United States v. Peters*, 843 F.3d 572, 575 (4th Cir. 2016); *see Concepcion*, 142 S. Ct. at 2396 (noting that the 2010 FSA was passed "to correct the harsh disparities between crack and powder cocaine sentencing"); *Collington*, 995 F.3d at 351 (noting that "the Fair Sentencing Act reduced sentencing disparities between cocaine and crack cocaine offenses, which were widely criticized for producing racially disproportionate sentencing outcomes"); *see also Wirsing*, 943 F.3d at 177–78. In particular, the crack-to-powder cocaine disparity was reduced from 100-to-1 to 18-to-1. *See, e.g.*, *Dorsey v. United States*, 567 U.S. 260, 264, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012); *Gravatt*, 953 F.3d at 260; *United States v. Black*, 737 F.3d 280, 282 (4th Cir. 2013), *cert. denied*, 572 U.S. 1071 (2014). And, Congress increased the threshold quantities needed to trigger mandatory sentencing ranges associated with crack cocaine offenses. *See Dorsey*, 567 U.S. at 269, 132 S.Ct. 2321; *Gravatt*, 953 F.3d at 260.

Under Section 2 of the 2010 FSA, the sentencing range for possession with intent to distribute less than 28 grams of cocaine base carries a maximum of 20 years of imprisonment; the sentencing range for possession with the intent to distribute more than 28 grams but less than 280 grams of cocaine base is five years to 40 years of imprisonment; and the sentencing range for possession with intent to distribute more than 280 grams of cocaine base is ten years to life imprisonment. Section 3 of the 2010 FSA eliminated the mandatory minimum sentence for simple possession.

Thereafter, the Sentencing Commission amended the Guidelines to conform to the 2010 FSA. *Gravatt*, 953 F.3d at 260. However, the 2010 FSA did "not apply its changes retroactively,"

15

so as to "alter statutory minimum terms of imprisonment" that were previously in effect. *Id.* With the enactment in 2018 of the First Step Act, Congress rectified the inequity. *Id.*

Section 404(b) of the 2018 FSA "made the Fair Sentencing Act sentence reductions retroactive...by authorizing district courts to impose a reduced sentence on specified 'covered offenses' as if the Fair Sentencing Act were in effect at the time the offenses were committed." *Lancaster*, 997 F.3d at 173; *see also Terry v. United States*, ⸺ U.S. ⸺, 141 S. Ct. 1858, 1862 (2021); *United States v. Thomas*, 32 F.4th 420, 423-26 (4th Cir. 2022); *Foster*, 2022 WL 2826184, at *1. In other words, under § 404 of the Act, the provisions of the 2010 FSA apply retroactively to a defendant who was sentenced *prior* to August 3, 2010, *i.e.*, the effective date of the 2010 FSA. *United States v. Charles*, 932 F.3d 153, 162 (4th Cir. 2019).

### III. Discussion

### A. First Step Act

Roberts argues that he is eligible for relief under Section 404 of the First Step Act because he committed the offenses for which he was convicted before August 3, 2010. ECF 604 at 13. However, as the government observes (ECF 616 at 19), the relevant date for Section 404 eligibility is the date of *sentencing*.

Roberts was sentenced on August 9, 2013, over three years after August 3, 2010, the effective date of the Fair Sentencing Act of 2010. *Id.* Therefore, as the government maintains, Roberts's sentence "was already imposed in accordance with the Fair Sentencing Act's amended quantity thresholds and he is not eligible for Section 404 relief." *Id.* Because Roberts was sentenced in 2013, long after the effective date of the Fair Sentencing Act of 2010 (August 3, 2010) he is ineligible for a sentence reduction under Section 404.

### B. Compassionate Release

#### 1. COVID-19[3]

The World Health Organization declared COVID-19 a global pandemic on March 11,

2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4]  COVID-19 spawned

"a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA*

*v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*,

2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths,

according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S.*

*COVID deaths after losing political battles*, REUTERS (May 12, 2022),

https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/.

And, as of August 23, 2022, COVID-19 has infected more than 93 million Americans.  *See*

*COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed August

23, 2022).

The judges of this Court "have written extensively about the pandemic." *United States v.*

*Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).

Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the

pandemic. *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described

---

[3] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

as the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

For a significant period of time, life as we have known it came to a halt. For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious. *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh. The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. In May 2022, it updated its guidance to reflect the most available data. *See*

*People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 2, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.  Nevertheless, the Court may consider the CDC's identification of risk factors.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to

stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr.

3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-

19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through*

*the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary

settings of correctional institutions have been ideal for incubating and transmitting the disease.

Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from

approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health,

School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons,

the inability to employ effective social distancing measures, and the many high-contact surfaces

within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S.

493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California

prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help

prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented

substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to

treat those who are infected.  As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3rd Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's

spread."[5]

---

[5] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent
weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise
Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020),
https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American
jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and
correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct.
29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities
are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17,
there were 13,657 new coronavirus infections reported across the state and federal prison

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division,

---

systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. TIMES (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.  Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.  As of September 2022, approximately 68% of the total U.S. population is fully vaccinated, including 31% of people from ages 5 to 11, 61% of people from ages 12 to 17, 74% of people from ages 18 to 64, and 92% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last updated September 29, 2022).

Moreover, approximately 107.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-

ncov/vaccines/booster-shot.html (last updated October 4, 2022).  And, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older.  *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance."  *See COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  It provides that administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of October 6, 2022, the BOP had 143,064 federal inmates and approximately 36,000 staff.  And, by that date, the BOP had administered 330,593 vaccine doses to staff and inmates.  *See* BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last accessed October 6, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. Times, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, Wall St. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. Times (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See,*

*e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022),         https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   Again, the country began to return to normalcy.

Unfortunately, that respite did not last long.   We soon experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.   In particular, a new subvariant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022),  https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.    As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.

However, in an interview on "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over. We still have a problem with COVID. We're still doing a lotta work on it. . . . But the pandemic is over." *Id.*

As of October 6, 2022, the BOP reported that 257 federal inmates, out of a total population of 143,064, and 407 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 48,787 inmates and 14,170 staff have recovered from the COVID-19 virus. In addition, 308 inmates and seven staff members have died from the virus.   The BOP has completed 128,704 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Gilmer, where defendant is incarcerated, the BOP reported that as of October 6, 2022, out of a total of 1,666 inmates, zero inmates and zero staff members have tested positive. One inmate in FCI Gilmer has died of COVID-19, and 283 inmates and 152 staff members have recovered at the facility. In addition, 178 staff members and 1,503 inmates at FCI Gilmer have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, FCI Gilmer (bop.gov) (last visited October 3, 2022).

## 2.  Contentions

Roberts asserts that "extraordinary and compelling reasons exist to grant relief in light of Robert's [sic] medical conditions carrying a 'high risk' for developing serious illness or death if infected with COVID-19." ECF 591 at 3; ECF 604 at 3. Roberts suffers from prediabetes, chronic embolism, thrombosis of vein and hypertension. ECF 591 at 12. These conditions are among those listed by the CDC as high risk of serious illness or death if infected with COVID-19. *Id.* at 13. In his Supplemental Memorandum, Roberts also cites his history of iron deficiency anemia and poor vision in both eyes as part of his history of medical conditions that make him vulnerable to COVID-19. ECF 604 at 4-5.

Roberts has been vaccinated.  But, he argues that the vaccine's effectiveness is not guaranteed because "the vaccine's length of conferred immunity is unknown, and it may not

immunize against various strains." ECF 604 at 9 (citing *Frequently Asked Questions about COVID-19 Vaccination*, CDC (July 20, 2022)).

Additionally, Roberts argues that he meets the "extraordinary and compelling" criteria for compassionate release because he would not qualify as a career offender if he were sentenced today. ECF 604 at 10. He observes that under *United States v. Norman*, 935 F.3d 232 (4th Cir. 2019), the underlying offense for which he was convicted is not a qualifying offense, and one of his two predicate offenses—felonious possession of CDS—also would not qualify as a proper predicate. *Id.* In that circumstance, he claims that he would have had a final offense level of 31 and a criminal history category of V, with Guidelines of 169 to 210 months of imprisonment. *See* U.S.S.G. §§ 2D1.1, 2D1.1(c)(3), 3E1.1(a), 3E1.1(b). Roberts has been incarcerated since December 4, 2012. ECF 604 at 11; ECF 606 -5 at 2.

The government asserts that Roberts does not meet the criteria of "extraordinary and compelling circumstances" because "the BOP has implemented safety measures that have greatly reduced the spread of COVID-19 within its prison facilities and is in the process of providing vaccines to all BOP staff and inmates, including [ Roberts], who is now fully vaccinated." ECF 616 at 6. The government concedes that Roberts would not qualify as a career offender under today's standards. *Id.* But, it argues that "such a disparity does not rise to the level of an 'extraordinary and compelling reason' for compassionate release." *Id.* As the Government points out, the sentence to which the parties agreed under the C Plea, and which the Court imposed, falls below the career offender guideline range applicable at the time. *Id.*

Finally, the government argues that, even if defendant is eligible for relief, this Court should deny relief due to "the nature and severity" of the offense for which Roberts was convicted, Roberts criminal history, and his criminal conduct while in the custody of BOP. *Id.*; *see* 616-2.

### 3.  Analysis

### a.  Exhaustion

As a threshold issue, it is plain that defendant has exhausted his administrative remedies. As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. Once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release. *See*, *e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted the First Step Act to allow incarcerated individuals to directly petition district courts for compassionate release so long as they first exhaust their administrative remedies.").

As noted, on May 12, 2020, the warden denied  Roberts' request for relief. ECF 591-1. His Motion followed.

### b.  Medical Conditions

As mentioned, the Motion is predicated, in part, on defendant's alleged vulnerability to COVID-19. ECF 591 at 1-2; ECF 604 at 1-2.   Roberts has provided the Court with copies of his medical records.  ECF 606-4. The records reveal that Roberts has numerous underlying health conditions, such as hypertension, prediabetes, iron deficiency anemia, chronic embolism and thrombosis of vein, and poor vision in both eyes. ECF 606-4 at 3, 21, 42, 58, 69, 99, 269, 278, 345-46, 389, 410, 413. Moreover, Roberts contracted COVID-19 in 2020, but he recovered. ECF 606-4 at 386. He is also vaccinated. ECF 606-4 at 417.

The government does not dispute Roberts's medical conditions. Rather, the government argues that COVID-19 does not pose a substantial risk to Roberts because of the BOP's "aggressive action to mitigate the danger of COVID-19 within its prison facilities." ECF 616 at 16.   At the time of the submission, these measures included limiting social visits, regularly screening inmates and staff, restricting contractor access, implementing quarantine procedures and isolation areas, providing remote legal access to inmates, reducing inmate movement, establishing regular COVID-19 compliance reviews, and increasing social distancing. *See* BOP Modified Operations, FEDERAL BUREAU OF PRISONS, last updated Nov. 25, 2020, https://www.bop.gov/coronavirus/covid19_status.jsp.

Additionally, the government asserts that  Roberts "has provided effective 'self-care' against the COVID-19 virus through vaccination."  ECF 616 at 23.  Therefore, it claims that he no longer presents an "extraordinary and compelling" medical reason for compassionate release.

The government's position is not persuasive. Indeed, the fact that  Roberts has been fully vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *United States v. Spriggs*, 2021 WL 1856667, at *3 (May 10, 2021). As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

Indeed, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable. In particular, the Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death. *See Rates of COVID-19 Cases and Death by Vaccination Status*, CDC, Mar. 17,

2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed October 14, 2022). Indeed, an analysis several months ago of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave." Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, WASH. POST (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

To that end, the CDC issued recommendations encouraging everyone ages 12 years and older to receive one COVID-19 booster shot after completing their primary COVID-19 vaccination series. *See COVID-19 Vaccine Boosters*, CDC, https://bit.ly/3MdQMM6 (last October 14, 2022). Moreover, all adults ages 50 years and older are eligible for a second and third booster shot. *See id.* And, the parties have not presented the Court with any evidence regarding whether defendant has received a booster.

Several judges of this Court have concluded that vaccination status does not render an inmate ineligible for compassionate release. *See e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

In addition, a defendant's eligibility for compassionate release is not defeated because a defendant has had COVID-19. What Judge Chuang said in *United States v. Fletcher*, TDC-05-0179, 2020 WL 3972142, at *3 (D. Md. July 13, 2020), is apt: "Although [the defendant] may now be less vulnerable or immune from coronavirus, there is no certainty about whether individuals who have already had COVID-19 now have immunity." *See also United States v. Corey*, JKB-09-0512, 2020 WL 5913238 at *2 (D. Md. Oct. 6, 2020) (highlighting that "it remains unknown . . . what sort of future complications an individual . . . might suffer following an apparent recovery"); *United States v. Heyward*, PWG-17-0527, 2020 WL 3547018, at *2 (D. Md. June 30, 2020) (noting in grant of compassionate release to individual who had survived the virus "that a secondary contraction of COVID-19 is possible").

Accordingly, given defendant's underlying health conditions, I am satisfied that he has established extraordinary and compelling circumstances under the compassionate release statute.

### c.  Section 3553(a) Factors

Even when a court finds extraordinary and compelling reasons for compassionate release, relief is only warranted under 18 U.S.C. § 3582(c)(1)(A) if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186.  The § 3553(a) factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Sentencing Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

Turning to the severity of the instant offense, conspiracy to distribute and possess with intent to distribute heroin and cocaine is undoubtedly serious.  In this case, the quantity of drugs

was enormous.  Roberts's decision to distribute and possess cocaine and heroin with intent to distribute created a substantial risk of harm to many others.

Moreover, Roberts's criminal history remains of concern to the Court.  As illustrated in the PSR,  Roberts eluded arrest for over a year after his indictment, having twice successfully fled from officers following traffic stops. ECF 370, ¶¶ 8-13.

As recounted earlier, defendant has previously been convicted of drug offenses. *Id.* ¶¶ 25, 49.  Notably, the sentences that followed those convictions proved to be insufficient to deter Roberts from engaging in criminal conduct.

In particular, Roberts received a 14-year sentence for his 1995 conviction, with all but four years suspended, to be followed by probation. *Id.*¶ 39. He later violated his probation, for which he received a 10-year sentence, consecutive to the five-year sentence imposed in Case 97CR0587, for the offense of Reckless Endangerment, as referenced in ECF 370, ¶¶ 41, 42. *See id.* ¶ 39. Roberts received a sentence of two years' imprisonment for his 1999 conviction for possession of CDS with intent to distribute. *Id.* ¶ 43.

In *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court acknowledged that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'" (quoting 18 U.S.C. § 3553(a)(1)).  And, the Court is encouraged by BOP records which indicate that defendant has participated in various educational and vocational programs while incarcerated, including courses concerning commercial driving, HVAC, health and nutrition, money management, foreign language, AIDS and disease prevention, and cognitive skills development. ECF 606-8. Roberts has also provided the Court with further information pertaining to his post-release plans and efforts to rehabilitate himself. Several family members

have written letters to the Court, and Jay Morrison, CEO of "Jay Morrison Academy," has promised an employment opportunity to Roberts and relocation assistance. ECF 606-12.

However, the Court notes that between May 2014 and January 2020, Roberts committed several BOP infractions. These include possession of contraband, possession of a hazardous tool, and destruction of contraband during a search. *See* ECF 606-6.

Roberts has served over 50% of his sentence. *See* ECF 606-5 at 2. And, Roberts would not qualify as a career offender if he were sentenced today. Therefore, the advisory Guidelines range, if he were sentenced today, would be 169 to 210 months, based on a final offense level of 31 and a criminal history category of V.

As I see it, defendant's immediate release would not adequately reflect the seriousness of his criminal conduct nor afford adequate protection to the community. However, numerous district courts in both this Circuit and others have granted sentence reductions without immediate release. *See, e.g.*, *United States v. Johnson*, RDB-07-0153, 2020 WL 6063733, at *5 (D. Md. Oct. 14, 2020) (reducing sentence from 360 months to 300 months); *United States v. Braxton*, No. 09-478, 2020 WL 4748536, at *5 (D. Md. Aug. 17, 2020) (reducing sentence from 246 months to 168 months); *United States v. Marks*, 455 F. Supp. 3d 17, 37-38 (W.D.N.Y. 2020) (reducing sentence from 40 years to 20 years); *United States v. Arey*, Crim. No. 5:05-00029, 461 F.Supp.3d 343, 2020 WL 2464796 (W.D. Va. May 13, 2020) (reducing sentence but denying immediate release); *United States v. Day*, 474 F. Supp. 3d 790 (E.D. Va. 2020) (same); *see also United States v. Zullo*, 976 F.3d 228, 327 (2d Cir. 2020) ("It bears remembering that compassionate release is a misnomer. 18 U.S.C. § 3582(c)(1)(A) in fact speaks of sentence reductions. A district court could, for instance, reduce but not eliminate a defendant's prison sentence . . . .").

**V. Conclusion**

For the reasons set forth above, I shall grant the Motion, in part. I shall reduce  Roberts's

sentence to 175 months, with the credit as reflected in Roberts's BOP records. *See* ECF 606-5.

Such a sentence is "sufficient, but not greater than necessary" to comply with the purposes of

sentencing. 18 U.S.C. § 3553(a).

An Order follows, consistent with this Memorandum Opinion.  An Amended Judgment

and Commitment Order shall issue.


Date: October 17, 2022                                    _____/s/_____

                                                         Ellen L.  Hollander
                                                         United States District Judge

35